Filed 8/8/25  P. v. Arredondo CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E084807 |
| v. | (Super.Ct.No. BAF2301164) |
| MARY LORENE ARREDONDO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Louis R. Hanoian, Judge.
(Retired Judge of the San Diego Super. Ct. assigned by the Chief Justice pursuant to
art. VI, § 6 of the Cal. Const.)  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and
Appellant.

No appearance for Plaintiff and Respondent.

1

# I.

## INTRODUCTION

A jury found defendant and appellant Mary Lorene Arredondo guilty of first degree murder (Pen. Code,[1] § 187) and true the allegation that defendant had personally and intentionally discharged a firearm proximately causing great bodily injury and death (§12022.53, subd. (d)). In a bifurcated proceeding, the trial court found true beyond a reasonable doubt the aggravating factors that defendant was armed with and used a gun (Cal. Rules of Court, rule 4.421 (a)(2)) and the offense involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness (Cal. Rules of Court, rule 4.421 (a)(1)). The trial court sentenced defendant to an aggregate indeterminate term of 50 years to life (25 years to life for the murder, plus a consecutive term of 25 years to life for the firearm discharge allegation) with 696 days credit for time served. The court ordered defendant to pay a $300 restitution fine (§ 1202.4, subd. (b)) and a stayed $300 parole revocation fine (§ 1202.45, subd. (c)). The court waived the $40 court operations fee and $30 criminal assessment fee (§ 1465.8, subd. (a)(1); Gov. Code, § 70373).

Defendant appeals from the judgment. Appointed counsel has filed a brief under the authority of *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*) and *Anders v. California* (1967) 386 U.S. 738 (*Anders*), requesting this court to conduct an independent review of the record to determine whether there are any arguable issues on appeal. In addition,

---

[1] All future statutory references are to the Penal Code.

defendant has had an opportunity to file a supplemental brief with this court and has not done so. After independently reviewing the record, we find no arguable error that would result in a disposition more favorable to defendant and affirm.

## II.

## FACTUAL BACKGROUND

A. *People's Evidence*

In October 2023, defendant lived with Adam Loza and Dwight Eastman in a trailer park (Space 19) in Hemet, California. At that time, defendant was Eastman's caretaker, and Loza's girlfriend. Defendant had also previously dated another resident of the trailer park, Joseph Schlone and they may have continued dating while defendant was involved with Loza. Defendant's daughter and another resident of the trailer park believed that defendant, Loza and Schlone, were involved in a love triangle.

Shortly after 8:00 p.m. on October 29, 2023, the manager of the trailer park and other residents heard two gunshots, followed by a third after a pause. The sound of gunshots in the area was common. Before the gunshots, residents had overheard an argument between defendant and Loza near the laundry room. One resident thought to herself, "Oh, [defendant] is yelling again." Defendant sounded angry at Loza, and said, "you're not going to fuck with me" or "You want to fuck me?" before she chased him through the breezeway into the hallway. According to one resident, defendant also stated after the first two shots, "well, he's not going to be messing with me here."

3

Surveillance footage captured some of the incident. In surveillance footage with a time stamp of 8:06 p.m., defendant can be seen with Loza in the trailer park. After Loza pulled out a cellphone, he stopped in front of the breezeway. While he was on his phone, defendant walked eastbound toward the street, and 16 seconds later, defendant turned around and faced Loza. Loza began walking towards her. While they stood next to each other, a muzzle flash from a gun causing a small explosion to propel the round from the weapon—can be seen coming from defendant towards Loza. Loza backed away with his hands up, and a cell phone still in his hands. Loza then ran towards the breezeway, with defendant chasing him. When Loza reached the breezeway, defendant's hands were up, and she was pointing out as if to shoot. After initially backing away, defendant reengaged with the gun in her hands and returned to the breezeway.

Joseph Schlone then emerged from the breezeway and walked in the direction of defendant's home. At this point, defendant still appeared to be holding the gun. Schlone approached defendant and tried to grab the gun, but defendant moved away and continued to walk eastbound. Defendant exited the breezeway and retrieved a bag outside. She then left her residence and headed eastbound on a bicycle with the bag.

At around 8:08 p.m., officers responded to the trailer park. One resident informed the officers that she had heard defendant arguing with Loza, and that defendant had been outside when the gunshots were heard. She had also observed defendant riding her bicycle outside the complex. When officers went to defendant's home, Eastman reported that defendant had left 30 minutes earlier. When the officers walked past the laundry

4

room at that time, they did not see any indicia of a shooting. A responding officer was "100 percent [certain]" that the laundry room door was not open, and he confirmed this observation by later checking his body camera footage. In addition, when the officers walked around the area with a flashlight, they found no casings or blood trail. Because officers found nothing associated with a shooting, they left.

At approximately 11:22 p.m., the trailer park manager walked over to the laundry room to investigate a report of someone sleeping inside. When he arrived, the door was open halfway, and Loza was lying on the ground inside, with blood on his head. He did not appear to be breathing. The manager called 911.

When authorities responded to that call, they found Loza in the laundry room. The external metal door was open, and Loza's foot extended through the door. Officers recovered a baggie of methamphetamine from Loza's clothing. Loza had gloves on both hands. No blood was found in the breezeway or outside the laundry room door, and there was no indication that that the body had been killed in a different location and moved to the laundry room. After finding the body, officers knocked on defendant's door for five to 10 minutes. They heard a woman's voice yell "go away." Eventually defendant came outside. She looked confused and asked what was going on.

Defendant maintained that she had nothing to do with Loza's death. She explained that she had left her home four hours earlier, around 7:30 p.m. or 8 p.m. After visiting one of her daughters in Banning, she returned to the trailer park about 30 minutes before officers arrived. She explained that Alicia Sanchez, her other daughter, had given

5

her a ride to and from Banning.  However, according to Sanchez, she had not seen her mother at all that day and did not drive her anywhere.  Defendant's hands were tested for gunshot residue; none was detected.

Officers found a pair of sandals and other clothing in Space 19.  On surveillance footage it appeared as if defendant was wearing the same sandals and clothing.  Although residue can be found on clothing, those items were not tested for such residue.  A casing was recovered in the hallway north of the restroom.  Another casing was found in front of Space 27 underneath the tire of a car.  The casings were the same caliber as used to kill Loza.  Loza's cause of death was determined to be multiple gunshot wounds.  He had one wound in his chest, and the other in his left shoulder.  Loza also had bruises, abrasions and contusions throughout the rest of his body.  After he was shot, Loza could have been mobile for a period of time.  Nevertheless, he would have died within minutes of sustaining those wounds.  At the time of his death, Loza, who was 40 years old, 219 pounds, and 5 feet 9 inches tall, had fentanyl and methamphetamine in his system; those drugs did not cause his death.  But the ingestion of methamphetamine in general can cause erratic behavior, aggression, and paranoia.

Two years before he was killed, Loza was a victim of another shooting that took place within a quarter of a mile from the trailer park.  One year before Loza was killed, he testified against the shooter in that case.  In August 2023, that person received a life sentence.

According to resident Dawn Barnett, defendant and Loza had argued earlier on October 23 and defendant's voice was raised. And in the late afternoon or early evening that day, Barnett had an altercation with defendant. Defendant had stood outside Barnett's home and shook her fence. Defendant had seemed upset and the two exchanged insults before Barnett went inside her home. Barnett acknowledged that she had never previously seen defendant with a gun. Barnett also acknowledged that she and defendant had "bad blood" over men. Defendant had previously accused Barnett of sleeping with Schlone. And eight months to a year earlier, defendant had slapped her.

Six months before the shooting, Zepeda had overheard a confrontation between Loza and Schlone, where defendant had intervened to break them up. Defendant told Loza not to mess with Schlone because he carried a gun. Zepeda was used to hearing defendant yell and observed that she had argued with Loza previously. Zepeda acknowledged that she had never seen defendant carry a firearm or act violently in the previous seven years that she had known her.

B. *Defense Evidence*

According to Officer Dominic Delbono, "[i]f the bullet is still in the body [of a shooting victim], there's typically blood that falls to the ground no matter what." Although there would be substantially more blood with the presence of an exit wound, he would still expect some blood loss even without one because when a bullet strikes a person, it still breaks the skin entering their body. He acknowledged that if the victim was wearing a T-shirt and a hoodie, that might affect the likelihood of blood being found

7

on the ground.  He also acknowledged that he had one case with a .22 caliber bullet to the chest where there was no blood on the ground and that the smaller the wound the less likely it would be to find any blood on the ground.

To Officer Delbono's knowledge, he was not aware of any information that suggested the 2021 shooting of Loza was related to the current incident.  Loza was shot by Tyrone Geeon September 3, 2021, about 400 feet away from the trailer park.  On August 11, 2023, Gee was sentenced to state prison for 4 years plus an indeterminate term of 50 years to life.  The officer was aware of the phrase, "'snitches get stiches,'" i.e., if you testify against someone else, you may be hurt later.  Although Loza testified in the trial, there was no information on the content of his testimony or whether he testified for the prosecution.

Defendant's friends attested to her character as a nonviolent person.  Brian Kohrell is a Navy veteran who lost his handyman business during the Covid pandemic and lived on the streets for over a year.  Defendant had opened her home to him and gave him a place to stay and rebuild his life.  He had two guns, and offered to take her to a pistol range, but she was never interested.  Kohrell has never seen defendant punch anyone, threaten anyone, or hold a weapon in a menacing manner.  However, he was not aware that defendant was a felon who was not permitted to be near firearms.  And he acknowledged that he had not seen the surveillance footage in this case.

Defendant's child's father, David Alcaraz, testified that he had dated defendant in 2015 and had a son together in 2018.  They argued verbally, but their arguments were

8

never physical or involved weapons. He had never seen defendant physically attack anyone or threaten anyone. He, however, was unaware of defendant's misdemeanor conviction in the 1990s for domestic battery, or her conviction for felony theft. Alcaraz acknowledged that he had a felony theft conviction from 2014 and that one requirement of such conviction was to not possess any guns. In his opinion, defendant was not the type of person who would kill someone, and he was surprised to learn that she was charged with murder.

III.

DISCUSSION

After defendant appealed, upon her request, this court appointed counsel to represent her. Upon examination of the record, counsel has filed a brief under the authority of *Wende*, *supra*, 25 Cal.3d 436 and *Anders*, *supra*, 386 U.S. 738, setting forth a statement of the case, a summary of the facts and potential arguable issues and requesting this court to conduct an independent review of the record. Counsel has identified the potential issues of whether there was sufficient evidence of premeditation and deliberation to support the first degree murder conviction, whether the trial court prejudicially erred by allowing the officer to narrate the entire surveillance video and offer testimony that defendant was "'pointing out as to shooting or going to shoot towards [Loza],'" and whether the trial court was required to instruct on heat of passion voluntary manslaughter based on evidence defendant was angry and an argument preceded the shooting.

9

We offered defendant an opportunity to file a personal supplemental brief, but she has not done so.

An appellate court conducts a review of the entire record to determine whether the record reveals any issues which, if resolved favorably to defendant, would result in reversal or modification of the judgment.  (*Wende*, *supra*, 25 Cal.3d at pp. 441-442; *People v. Feggans* (1967) 67 Cal.2d 444, 447-448; *Anders*, *supra*, 386 U.S. at p. 744; see *People v. Johnson* (1981) 123 Cal.App.3d 106, 109-112.)

Pursuant to the mandate of *People v. Kelly* (2006) 40 Cal.4th 106, we have independently reviewed the entire record for potential error and find no arguable error that would result in a disposition more favorable to defendant.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:


FIELDS
J.


RAPHAEL
J.

10